THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARY JILL STONE,                              :
                                              :
        Plaintiff,                            : CIVIL ACTION NO. 3:18-CV-1640
                                              : (JUDGE MARIANI)
        v.                                    :
                                              :
WEST RIVER GROUP,                             :
                                              :
        Defendant.                            :

## MEMORANDUM OPINION
### I. INTRODUCTION

Cross motions for summary judgment are pending before the Court. Plaintiff Mary

Jill Stone ("Plaintiff") seeks summary judgment in her favor on all issues in controversy

(Doc. 29 ¶ 5), as does Defendant West River Group ("Defendant") (Doc. 34 ¶ 9). This

action arises from Plaintiff's termination from employment with the West River Group where

she had worked as an independent contractor from 2007 to 2015 and as a contract

employee thereafter. (Doc. 36 ¶¶ 1-2; Doc. 41 ¶¶ 1-2.) Plaintiff's contract was terminated

on March 17, 2017. (*Id.* ¶ 13.) Plaintiff was sixty-nine years old at the time of her

termination. (Doc. 31 ¶ 1; Doc. 39 ¶ 1.) In her four-count Complaint, Plaintiff asserts claims

under the Age Discrimination in Employment Act ("ADEA") for discrimination based on

differential treatment and hostile work environment (Count I) and retaliation (Count II) and

the Pennsylvania Human Relations Act ("PHRA") claims on the same grounds (Counts III,

IV).  (Doc. 1 at 20-28.)  For the reasons that follow, Plaintiff's Motion will be denied and

Defendant's Motion will be granted.

## II. STATEMENT OF UNDISPUTED FACTS[1]

Plaintiff was born on August 17, 1948, and was sixty-nine years old when she was

terminated on March 17, 2017.  (Doc. 31 ¶ 1; Doc. 39 ¶ 1.)  She was employed by

Defendant at the time of her termination—from 2007 to 2015 she worked as an independent

contractor, and beginning in 2015 she worked as a contract employee.  (Doc. 36 ¶¶ 1-2;

Doc. 41 ¶¶ 1-2.)  Plaintiff held previous employment with the United States Postal

Inspection Service ("USPIS") from 1983 through 2006.  (Doc. 31 ¶ 2; Doc. 39  ¶ 2.)

Defendant provides employees to the USPIS to work at the direction of the USPIS.  (Doc.

36 ¶ 3; Doc. 41 ¶ 3.)  Plaintiff took her direction from employees of the USPIS.  (Doc. 36 ¶

4; Doc. 41 ¶ 4.)

Plaintiff was involved with the Telephone Disruption Program during her

employment.  (*See* Doc. 31 ¶¶ 6-9; Doc. 39 ¶¶ 6-9.)  The Telephone Disruption Program

belongs to the USPIS, and Plaintiff was hired as a contractor to perform functions on the

program.  (Doc. 36 ¶ 26; Doc. 41 ¶ 26.)  Defendant did not tell Plaintiff what tasks she was

to perform daily because all direction came from USPIS.  (Doc. 31 ¶ 5; Doc. 39 ¶ 5.)

---

[1] Because the parties cross-reference statements of material fact and exhibits, e.g., Plaintiff references the statement of facts and exhibits submitted with her summary judgment motion in her opposition to Defendant's motion (*see, e.g.*, Doc. 38 at 8), the Court's Statement of Undisputed Facts consolidates the statements of both parties and response thereto (Docs. 31, 36, 39, 41).

The Telephone Disruption Program was designed to prevent fraud from occurring and was described in detail by Plaintiff at her deposition.[2]  (Doc. 31 ¶ 6; Doc. 39 ¶ 6.)  She succinctly described the Telephone Disruption Program as the disruption of fraudulent telephone numbers contained in mailings regarding fraudulent schemes which are identified through the United States mail from bulk mailings.  (Stone Dep. 19:10-20:10, Doc. 32-1 at 20-21.)  By "disrupt the number" Plaintiff meant to "shut it down."  (*Id.* 20:24-25, Doc. 32-1 at 21.)  Plaintiff explained that she worked with Canadians on the program and, from her side, she was the only one involved with her particular role being to "actually identify telephone providers, get them on board to disrupt the numbers."  (*Id.* 21:12-16, Doc. 32-1 at 22.)  Her supervisor, Nick Alicia, "assisted with the contacts to the Recovery Center and USPIS legal which was central to the Telephone Disruption Program."  (Doc. 31 ¶ 4; Doc. 39 ¶ 4.)  Plaintiff sent out a weekly report, called the FIDO Report, to show numbers that had been interrupted so that she would not get reports regarding schemes that had already been interrupted.  (Stone Dep. 23:9-24:3, Doc. 32-1 at 24-25.)

Alejandro Almaguer works for the USPIS in Cincinnati, Ohio, and is employed as an Inspector Attorney.  (Doc. 31 ¶ 22; Doc. 39 ¶ 22.)  He testified that he was detailed to Washington, D.C., to be the Program Manager for the Fraud Program for USPIS.  (Doc. 31

---

[2] This included information about what Plaintiff called the "Clip-N-Ship program," explaining that she "identified the mail in the counterfeit Click-N-Ships" which were "Express mail or Priority Mail where they just pre-printed the label.  Postage was actually never paid . . . so the actual postage is counterfeit." (Stone Dep. 22:17-25, Doc. 32-1 at 23.)

¶ 23; Doc. 39 ¶ 23.)  He described his duties to be "to shepherd the Fraud Program on a national basis."  (*Id*.)

While on detail to Washington, D.C., Almaguer drove to Scranton, Pennsylvania, for one day in February 2017 solely to meet with Plaintiff.  (Doc. 31 ¶ 25; Doc. 39 ¶ 25.) Almaguer said that he was instructed by his supervisors to specifically reach out to Plaintiff and set up a meeting to learn what she did on a daily basis.  (Doc. 31 ¶ 26; Doc. 39 ¶ 26.) He testified that he wanted to memorialize what Plaintiff did with the Telephone Disruption Program.  (Doc. 31 ¶ 8; Doc. 39 ¶ 8.)   He also wanted Plaintiff to provide him with her contact list which contained the fraud prevention contacts she had developed during the course of her employment.  (*Id*.)  Almaguer further testified that he believed Plaintiff contacted the Recovery Center and instructed them to send her the fraudulent Clink-N-Ship letters.  (Doc. 31 ¶ 28; Doc. 39 ¶ 28.)  He said he believed that Plaintiff's use of the "dead letter" mail from the Recovery Center as part of her Telephone Disruption Program was a violation of postal regulations and he told Plaintiff that she was no longer able to open mail from the mail recovery center as part of her fraud detection program.  (Doc. 31 ¶ 29; Doc. 39 ¶ 29; Doc. 36 ¶ 8; Doc. 41 ¶ 8.)  When he informed Plaintiff of this, she followed his instruction.  (Doc. 36 ¶ 12; Doc. 41 ¶ 12.)  Almaguer was not able to identify the postal regulation which Plaintiff violated.  (Doc. 31 ¶ 30; Doc. 39 ¶ 39.)  Plaintiff testified that Almaguer put new demands on her and requested numerous items from her.  (Doc. 36 ¶ 6; Doc. 41 ¶ 6.)

Plaintiff was terminated three weeks after Almaguer's arrival based upon his

perception, and that of Defendant, that Plaintiff was insubordinate in a widely distributed

email. (Doc. 31 ¶ 11; Doc. 39 ¶ 11.) The email, which was described as a FIDO Report, did

not mention Almaguer by name. (Doc. 31 ¶ 13; Doc. 39 ¶ 13.) The March 17, 2017, email

was sent to numerous individuals throughout the USPIS and indicated there would be

thousands of additional victims because Plaintiff was no longer able to open mail,. (Doc. 36

¶ 9; Doc. 41 ¶ 9.) She also indicated that they would be "protecting the suspects while our

postal customers are on their own." (Doc. 36 ¶ 10; Doc. 41 ¶ 10.) The email was sent at

9:02 a.m. on March 17, 2017, and Plaintiff was fired at 7:15 p.m. that evening. (Doc. 36 ¶

11; Doc. ¶ 11.)

Almaguer testified that he viewed the "tenor" of Plaintiff's FIDO Report to be

insubordinate. (Doc. 31 ¶ 31; Doc. 39 ¶ 31.) He also testified that he told Defendant he

"[d]id not need her in that position after she sent the email." (Doc. 31 ¶ 33 (quoting

Almaguer Dep. 29:6-7, Doc. 32-5 at 30); Doc. 39 ¶ 33.) Plaintiff was fired in a phone call

from the president of West River Group, Bobby Weightman, who told her that her contract

was terminated due to insubordination. (Doc. 36 ¶ 13; Doc. 41 ¶ 13.) Plaintiff testified that

she was told it was decided that the USPIS no longer required her services. (Doc. 36 ¶ 12;

Doc. 41 ¶ 12.)

Weightman testified that Plaintiff was terminated for insubordination, that the USPIC

had lost confidence in her, and the USPIS requested that she be removed from the project.

(Doc. 36 ¶¶ 19, 20; Doc. 41 ¶¶ 19, 20.)  Plaintiff claims she was wrongly terminated because of her age and testified that the alleged acts of discrimination against her were all attributable to Almaguer.  (Doc. 36 ¶ 17; Doc. 41 ¶ 17.)  When asked at her deposition how Defendant was complicit in the age discrimination, Plaintiff testified that "they should have fought for me."  (Doc. 36 ¶ 7; Doc. 41 ¶ 7.)

Weightman testified that the company has an employee handbook that explains disciplinary action up to termination.  (Weightman Dep.  19:17-19, Doc. 32-3 at 20-21.)  He described a "tiered disciplinary response" and said the handbook contains a statement that the company does not have to follow that for "whatever particular reason."  (Doc. 31 ¶ 17; Doc. 39 ¶ 17; Weightman Dep. 20:1-5, Doc. 32-3 at 21.)

Thomas DellaFera, Plaintiff's direct supervisor and liaison between Defendant and the USPIS, testified that Defendant had situations where a conflict developed between a contract employee and the postal service manager and Defendant had tried to resolve the problems.  (Doc. 31 ¶ 20; Doc. 39 ¶ 20.)  DellaFera further testified that Plaintiff's email was "tough for them to swallow" and Almaguer did not like it at all.  (Doc. 31 ¶ 21; Doc. 39 ¶ 21.)  In this case, Defendant did not do anything to try and resolve the issue.  (*Id.*)

## III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party, and a factual dispute

is material only if it might affect the outcome of the suit under governing law." *Kaucher v.*

*County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of

those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P.

56(a).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990).  Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the

record . . . or showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support

the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should

be granted, "[t]he court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3).  "Inferences should be drawn in the light

most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

A district court "should consider cross-motions for summary judgment separately and apply the burden of production to each motion."[3] *Beenick v. LeFebvre*, 684 F. App'x 200, 205 (3d Cir. 2017) (not precedential) (citing *Lawrence*, 527 F.3d at 310).  "If upon review of cross motions for summary judgment [the court] find[s] no genuine dispute over material facts, then [the court] will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.,* 143 F.3d 139, 145-46 (3rd Cir.1998)).

## IV. ANALYSIS

### A. Defendant's Motion

In response to Plaintiff's contention that Defendant discriminated against her and retaliated against her based on age in violation of the ADEA and PHRA when it terminated

---

[3] *Beenick* further explains the plaintiff

argues that the District Court failed to apply the correct standard on cross-motions for summary judgment because it did not fully consider his motion for partial summary judgment. Beenick is correct that a District Court should consider cross-motions for summary judgment separately and apply the appropriate burden of production to each motion. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The District Court did not violate this rule because it did not consider the cross-motions simultaneously. Rather, it addressed Defendants' motion for summary judgment first. By proceeding with Defendants' motion first, the District Court viewed the evidence in the light most favorable to Beenick and concluded that Defendants were entitled to summary judgment on all of his claims. That conclusion ended the case and mooted any need to consider Beenick's cross-motion for partial summary judgment.

*Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017).

her in March 2017 (Doc. 1), Defendant asserts it is entitled to summary judgment on the

discrimination and retaliation claims. (Doc. 35 at 2.) In her opposition brief, Plaintiff

contends that she is entitled to summary judgment on these claims. (Doc. 38 at 2.) The

Court concludes that Defendant has satisfied its burden of showing that summary judgment

is appropriate in its favor.

*1. Age Discrimination Based on Differential Treatment*

Defendant first argues that Plaintiff's disparate treatment age discrimination claim in

Counts I and III of the Complaint (Doc. 1 at 20, 26) fails because she cannot establish a

prima facie case of discrimination and, if the Court determines that she has done so, she

cannot show that the reason for her termination was a pretext for discrimination. (Doc. 35 at

5-10.) Plaintiff responds that evidence of record shows that she has established a prima

facie case and that Defendant's proffered reason for her termination was a pretext. (Doc.

38 at 8-17.)

The ADEA prohibits employers from discriminating against individuals in hiring,

discharge, compensation, terms, conditions, or privileges of employment on the basis of

their age.[4] *See* 29 U.S.C. § 623(a)(1). As summarized in *Palmer v. Britton Industries, Inc.*,

662 F. App'x 147 (3d Cir. 2016) (not precedential), "[t]he Federal Age Discrimination in

Employment Act prohibits employers from taking adverse action against an employee who

---

[4] ADEA and PHRA claims are appropriately considered under the same standards. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citations omitted).

is at least 40 years old, 29 U.S.C. § 631(a), 'because of such individual's age.' 29 U.S.C. § 623(a)." 662 F. App'x at 150.  To establish a disparate treatment claim, the "[p]laintiff ha[s] the burden to show that his 'age was the 'but-for' cause of the employer's adverse action.'" *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

Following *Gross*, the Court of Appeals for the Third Circuit confirmed that the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), is used when a plaintiff does not present direct evidence of discrimination.  *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).  The parties agree the burden shifting framework applies here. (Doc. 35 at 4; Doc. 38 at 3.)

Under *McDonnell Douglas*, the plaintiff bears the initial burden of showing a prima facie case of discrimination.  411 U.S. at 802.  Once the plaintiff establishes a prima facie case, the burden shifts to the defendant "to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith*, 589 F.3d at 689.  "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (*citing Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)).  "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (*citing Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir. 2003)).

11

Once the defendant offers a legitimate non-discriminatory reason, "the burden of production [shifts] back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426 (*citing Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). To survive summary judgment, "the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

### i.  Prima Facie Case

The parties first dispute whether Plaintiff can establish a prima facie case of age discrimination. (Doc. 35 at 5-6; Doc. 38 at 6-17.) The Court concludes that Plaintiff has failed to offer sufficient evidence to satisfy her burden at this stage.

The Supreme Court has explained "that the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.*" O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). This showing "in effect creates a presumption that the employer unlawfully discriminated against the employee," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 254 (1981). The burden of establishing a prima facie case is not meant to be onerous, as the prima facie framework merely provides "a sensible, orderly way to evaluate the

evidence" to determine whether it is adequate to create an inference of discrimination.

*Furnco Const. Corp. v. Waters,* 438 U.S. 567, 577 (1978); *see also Jakimas v. Hoffmann–*

*La Roche, Inc.,* 485 F.3d 770, 787 (3d Cir.2007) (citing *Tex. Dep't of Cmty. Affairs v.*

*Burdine,* 450 U.S. 248, 253 (1981)).

    To warrant this rebuttable presumption "there must be at least a logical connection

between each element of the prima facie case and the illegal discrimination" alleged.

*O'Connor*, 517 U.S. at 311-12.  The elements of a *prima facie* case of age discrimination

are that:

> (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse
> employment decision; (3) the plaintiff was qualified for the position in question;
> and (4) the plaintiff was ultimately replaced by another employee who was
> sufficiently younger so as to support an inference of a discriminatory motive.

*Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing

*Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir.2013).  "Where the plaintiff is not directly

replaced, the fourth element is satisfied if the plaintiff can provide facts which 'if otherwise

unexplained, are more likely than not based on the consideration of impermissible

factors.'"  *Id.* (quoting *Pivirotto [v. Innovative Systems, Inc., 191 F.3d 344,* 352 (3d Cir.

1999)]).  The Third Circuit "has indicated the *prima facie* case is not 'intended to be rigid,

mechanized, or ritualistic.'"  *Id.* (quoting *Pivirotto, 191* F.3d at 352).

    Defendant maintains that summary judgment in its favor is appropriate because

Plaintiff's evidence is insufficient to support the fourth element of the prima facie case

because she has not shown that she was replaced by someone sufficiently younger nor has she shown that she was treated differently because of her age.  (Doc. 35 at 5-6.)  Plaintiff contends that she has satisfied this element on both counts.  (Doc. 38 at 8, 14.)

As to whether Plaintiff was replaced by someone sufficiently younger to support an inference of discrimination, Plaintiff avers that she was replaced by Anna Higa who was at least ten years younger than she.  (Doc. 38 at 14-15.)  In support of her assertion, Plaintiff cites her Affidavit stating that she was replaced by Higa who was at least ten years younger and an exhibit attached thereto.  (*Id.* (citing Pl.'s Aff. ¶ 78 (citing Ex. F), Doc. 32-2 at 17; Ex. F, Doc. 32-2 at 42.)   Exhibit F is an email from Higa to several individuals addressed as "Global Security and Cross Border Partnerships POCs" with "FIDO update" identified as the subject.  (Doc. 32-2 at 42.)  The email states the following:

> The phone termination program is under review.  Until the program is up and running I will hold the requests in a depository until the program is reset.
>
> Please be advised that the FIDO report will not be published for the time being.

(*Id.*)  This email alone does not establish that Plaintiff was replaced by Higa—it provides very limited factual information about the status of the program and FIDO Report with no implication regarding the author's role.  Thus, this evidence does not show that Plaintiff was replaced by someone sufficiently younger to support an inference of discrimination.

Because Plaintiff does not provide facts from which it can be inferred that someone sufficiently younger replaced her, Plaintiff can "provide facts which 'if otherwise unexplained,

are more likely than not based on the consideration of impermissible factors.'" *Willis, 808 F.3d at 644 (quoting *Pivirotto,* 191 F.3d at 352). Considering this alternative analysis, Plaintiff contends that she was treated less favorably than other employees of West River Group who were not in the protected class. (Doc. 38 at 8.) In support of the assertion, Plaintiff points to a statement by DellaFera that the company "had employment situations where a conflict developed between one of West River Group's employees and a postal service manager and West River Group tried to resolve 'those situations.'" (Doc. 38 at 8-9 (citing Doc. 31 ¶ 20).)

As Defendant points out, Plaintiff has failed to provide any facts regarding those instances or the age of those involved. (*See* Doc. 42 at 2.) Plaintiff does not acknowledge the fact that DellaFera distinguished this case from those where conflicts with the Postal Service manager had been resolved: in those cases Defendant was able to talk with the manager and remedy the situation where here "the manager . . . was not interested in resolving it peacefully" and, because the March 17th email had some USPIS executives on it, the chain of command went above Almaguer and Nichole Davis, Almaguer's manager with whom DellaFera spoke after Plaintiff sent out the email. (DellaFera Dep. 32:14-34:6, Doc. 32-4 at 34-36.)

Although the burden at the prima facie stage is not onerous, some specificity is required. In *Willis*, the Circuit Court noted that "[a] passing reference to retirement age and [the plaintiff's] own belief that age discrimination occurred do not comprise sufficient

15

evidence that similarly situated, substantially younger employees were more favorably

treated, and therefore do not satisfy the fourth element of a prima facie case."  808 F.3d at

646 (citing *Pivirotto,* 191 F.3d at 352).  Here, a passing reference to DellaFera's statement

that some other situations were resolved differently and Plaintiff's own belief that age

discrimination occurred "do not comprise sufficient evidence that similarly situated,

substantially younger employees were more favorably treated, and therefore do not satisfy

the fourth element of a prima facie case." *Id.*  Because Plaintiff has not come forward with

sufficient facts and supporting evidence to establish the fourth element of a prima facie case

of age discrimination, Defendant is entitled to summary judgment on this claim.

However, in an abundance of caution, the Court will assume arguendo that Plaintiff

satisfied the prima facie burden and proceed with the remaining steps of the *McDonnell*

*Douglas* analysis.

## ii. Reason for the Adverse Action

Defendant asserts that Plaintiff's termination was based solely on her March 17,

2017, email and the fact that Defendant's client, the USPIS, requested that she be removed

from the project.  (Doc. 35 at 7.)  Plaintiff states that Defendant has not carried its burden at

this stage of the *McDonnell Douglas* analysis.  (Doc. 38 at 17.)  The Court concludes that

Defendant has satisfied its burden of production.

> Once the plaintiff has successfully established a *prima facie* case
> creating an inference of discrimination, the burden shifts to the employer who
> must "articulate a legitimate nondiscriminatory reason for the adverse

employment action." *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 412 (3d Cir.1999) (citing *Keller,* 130 F.3d at 1108). This second step of *McDonnell Douglas* does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Instead, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons. *Fuentes,* 32 F.3d at 763.

*Willis*, 808 F.3d at 644.

Defendant supports its articulated reason with citations to the record where

Weightman, DellaFera, and Almaguer testified that the USPIS requested that Plaintiff be

removed from the project. (Doc. 35 at 7.) Plaintiff articulates the following basis for her

conclusion that Defendant has not carried its burden of coming forward with a legitimate

nondiscriminatory reason for the termination:

> West River has adopted the subjective and overly sensitive view of Almaguer that the March 2017 email of Ms. Stone was insubordinate. An objective review of the email and the context of same introduces major questions as to the legitimacy of the Defendants [sic] stated rationale for discharge (Compilation Tab B, ¶ 40-41, 54-73, Exhibit "D").

(Doc. 38 at 19.) With this assertion, Plaintiff provides a reason to discount Almaguer's

response to the email, but she does not discount Defendant's proffered reason for

termination, i.e., that USPIS requested she be removed from the project. Therefore,

pursuant to stage 2 considerations, Plaintiff presents no legally significant opposition to the

legitimacy of Defendant's articulated reason for termination. On this record, the Court

concludes that a reasonable factfinder could determine that Defendant terminated Plaintiff

because of the March 17, 2017, email and the subsequent request of the USPIS that she be removed from the USPIS project.

### iii. Pretext for Discrimination

Defendant maintains that "Plaintiff has produced no evidence to establish that the basis for her termination, sending an insubordinate email and being removed from the project, was pretext for age discrimination." (Doc. 35 at 10.)  Plaintiff responds that she has demonstrated that the proffered for her termination was pretextual.  (Doc. 38 at 19.)  The Court concludes that Plaintiff has not shown pretext.

Once the employer satisfies the second step of the analysis, "the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Willis*, 808 F.3d at 644.  As set out above, in *Fuentes,* the Third Circuit recognized two ways in which a plaintiff can demonstrate that the employer's legitimate, nondiscriminatory reason was pretextual.  32 F.3d at 762.

> The first way to show pretext is for the plaintiff to point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action.  [32 F.3d] at 765.  In order to raise sufficient disbelief, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." *Id.*

Willis, 808 F.3d at 644-45.

18

Plaintiff states that she has met her burden under this prong and asserts the

following pretext argument:

> Plaintiff Stone submits that the career motivated Almaguer who traveled to
> Scranton to learn the "ins and outs" of the Telephone Disruption Program from
> Stone could have easily sent a Memo or directive to stop the shipments of the
> Erks from Recovery Center in Atlanta to Scranton. The only reason why he
> traveled to Scranton, it can be viewed, was to take the Program Ms. Stone has
> developed for his own. His age insensitive comments do not mask his true
> motivation: to take her program and dismiss Stone from employment so that all
> the accolades that flowed to Ms. Stone could be directed to Almaguer. The
> Court should note that Ms. Stone always got along with her supervisors
> (Compilation Tab "B", ¶ 63). The evidences [sic] establishes pre text [sic] due
> to the vague and accurate March FIDDO report which Defendants viewed as
> insubordinate. This decision is buttressed in the context of Almaguer as an
> "interloper" as to the Telephone Disruption Program and the March FIDDO
> Report.

(Doc. 38 at 21.)

With this argument, Plaintiff posits that Almaguer's true motivation was to take the

Telephone Disruption Program for his own and thereby discounts an inference that the age-

related comments allegedly made by Almaguer were indicative of discriminatory animus and

motivated his actions.[5]  Further, Plaintiff's statement provides no information from which an

inference can be drawn that Defendant's proffered reason is unworthy of credence.

Importantly, evidence of record consistently supports the reason provided by

Defendant. i.e., Plaintiff's termination was based on her March 17, 2017, email and the fact

_____

[5] The Court will address Almaguer's alleged statements under the second prong of the *Fuentes*'
analysis.

that Defendant's client, the USPIS, requested that she be removed from the project.  (Doc.

35 at 7.)  For example, Weightman testified that he terminated Plaintiff after receiving an

email from Defendant's USPIS liaison (DellaFera), which indicated that "Inspector

Almaguer, his supervisor and the contracting officer representative . . . all agreed that her

actions were insubordinate, that they had lost confidence in her abilities to do the job, and

requested her to be removed."  (Weightman Dep. 26:17-22, Doc. 32-3 at 18.)  DellaFera

testified that the email Plaintiff had sent out (the March 17, 2017, FIDO Report) was the

reason for her termination and the person he had spoken with about the situation was

Nichole Davis, a USPIS manager.  (DellaFera Dep. 11:21-12:3, 15:15-16, 33:12-14, Doc.

32-4 at 13-14, 17, 35.)  Almaguer testified that he had talked with Davis after he saw

Plaintiff's email and they discussed that the email was "very inappropriate and

insubordinate.  I discussed that it was inaccurate."  (Almaguer Dep. 37:19-25, Doc. 32-5 at

38.)  He also discussed removing Plaintiff from the project.  (*Id.* 38:8-9, Doc. 32-5 at 39.)

When asked who made the decision that the USPIS no longer needed Plaintiff's services,

Almaguer stated "I think that was a decision in concert with myself, Nichole Davis, and the

INC, Regina Faulkerson; I think that would be Nichole Davis's supervisor at the time."  (*Id.*

40:25-41:8, Doc. 32-5 at 41-42.)

        The email sent from DellaFera to Weightman on March 17, 2017, at 4:54 p.m. with

the Subject "Separation Request; Jill Stone – Scranton" (Doc. 36-2 at 1) further supports

Defendant's proffered reason for terminating Plaintiff.  DellaFera states therein that

I met earlier today with the COR and Fraud Program management regarding the recent actions of West River Group contractor Jill Stone.  MS Stone has lost the confidence of the Inspection Service based on her actions and communications itemized below.  As a result it was decided the Inspection Service no longer requires the services of MS Stone.  They would like MS Stone to be notified after the close of business today that effective immediately she will no longer be supporting the Inspection Service.  Ms. Stone may make arrangements to retrieve her personal belongings by calling Inspector Almaguer . . . .

. . . .

Supporting Information: Below are the contents of an email from Postal Inspector Almaguer describing the events that support the need to end Stone's engagement with the Inspection Service. . . . Please notify me once Ms. Stone has been notified of the Decision.

(DellaFera March 17, 2017, email, Doc. 36-2 at 1.)  The email contains the following

supporting information:

1. On February 16, 2017, I met with West River Contractor Jill Stone regarding her duties for the Telephone Disruption Program (TDP).  During that meeting I discovered that Ms. Stone has been performing various activities not in accordance with Postal Regulations.  For example, Ms. Stone contacted the Mail Recover[y] Center and directed them to send her counterfeit Click n Ship postage.  Ms. Stone stated that she would then open the letters to find phone numbers for termination under TDP.

2. On March 13, 2017, I spoke with Ms. Stone and sent a follow up email to her informing her that I directed the MRC to cease sending her any letters because it was against Postal Regulations.  She objected to my decision and stated that she had various approvals; however, she could not provide any names or documentation.  She stated that the Inspection Service Office of Counsel had given approval for this practice.  I informed her that Office of Counsel had not authorized the practice.

3. Today, Ms. Stone sent the email below to a wide array of inspectors, Team Leaders, AICs, and NCs with clear falsehoods.  Specifically, Ms. Stone stated

> that the practice was approved by Postal HQ and USPIS Legal.  This is not
> true.  Further, Ms. Stone characterized the decision to cease the MRC letters
> as negative and "protecting the suspects."

(*Id*.)  Almaguer testified that the source of the supporting information quoted above is an

email he sent to Nichole Davis on March 17, 2017, at 3:16 p.m.  (Almaguer Dep. 39:3-19,

Doc. 32-5 at 40.)

The foregoing review of evidence consistently supports Defendant's assertion that

the basis for Plaintiff's termination was "sending an insubordinate email and being removed

from the project" (Doc. 35 at 10).  With no countervailing evidence, Plaintiff has not raised a

sufficient disbelief in the proffered reason to show pretext--she has produced no evidence

which indicates "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions" in Defendant's proffered reason.  *Fuentes*, 32 F.3d at 765.  Therefore, a

reasonable jury could not conclude based on the evidence proffered by Plaintiff that

Defendant's legitimate reason was a pretext for discharging her because of her age under

the first *Fuentes'* prong.

*Willis* summarized the second method of establishing pretext as follows:

> the second way a plaintiff can establish pretext is to point to evidence that
> would allow a factfinder to believe that the plaintiff's age was "more likely than
> not a . . . determinative cause" of the employer's action.  *Id.* at 764.  Specifically,
> the plaintiff can show pretext this way by presenting evidence "with sufficient
> probative force" so as to allow the factfinder to "conclude by a preponderance
> of the evidence that age was a . . . determinative factor."  *Simpson,* 142 F.3d
> at 644–45 (citing *Keller,* 130 F.3d at 1111). Pointing to evidence demonstrating
> any of the following satisfies this second way to prove pretext: (1) the defendant
> previously discriminated against the plaintiff; (2) the defendant discriminated

against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. *Simpson,* 142 F.3d at 645 (citing *Fuentes,* 32 F.3d at 765). If this step is satisfied, at trial the plaintiff must convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination. *Fuentes,* 32 F.3d at 763.

*Willis*, 808 F.3d at 644–45.

In support of her assertion that she has shown pretext under the second method set out in *Fuentes*, Plaintiff states that she relies on the evidence set out in the fourth prong of the prima facie case. (Doc. 38 at 22.)  As set out above, the Court has found the evidence proffered in support of the fourth prima facie prong insufficient to satisfy Plaintiff's initial burden. *See supra* pp. 14-16.  In the pretext context, the Court finds no basis to conclude that Plaintiff has presented evidence that "1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably," *Simpson,* 142 F.3d at 645.  Rather, Plaintiff testified at her deposition that she attributed all alleged acts of discrimination against her to Almaguer and that Defendant was complicit in age discrimination because the company should have fought for her when USPIS removed her from the project.  (Doc. 36 ¶ 17; Doc. 41 ¶ 17.)  She presents no evidence that Defendant did not fight for her because of age-based discriminatory animus.

Because Plaintiff points to statements attributed to Almaguer as evidence which gives rise to an inference of discrimination (Doc. 38 at 15), the Court will consider what

effect, if any, Almaguer's alleged statements have on the question of whether Defendant's

proffered reason for termination was pretextual.  Plaintiff states the following about

Almaguer's conduct and comments:

> Almaguer, on behalf of West River, made statements as he was attempting to learn everything she did in her nationally recognized position of employment, such that Almaguer discriminated against the Plaintiff by justifying his unreasonable request for her Telephone Disruption Program with statement such as "how old are you"; "we don't know how long you are going to be here"; and "how long do you think you are going to be here" (Compilation Tab "A", N.T. 38, 46). In addition, the most demeaning statement by Almaguer to Plaintiff as he made a request for her to provide him a complete description of her exemplary work was when he said: "You can be gone at any time." (Compilation Tab "A", N.T. 47).

(Doc. 38 at 15.)  Almaguer denies making these statements.  (*See, e.g.*, Doc. 31 ¶ 9; Doc.

39 ¶ 9.)  However, viewed in the light most favorable to Plaintiff, at this stage of the

proceedings, the Court accepts the statements as true.  *See supra* pp. 7-8.

Accepting the statements as true does not provide a basis for finding pretext.  First,

Plaintiff does not show how the statements were made "on behalf of West River."  (Doc. 38

at 15.)  Almaguer was a USPIS employee who did not take direction from Defendant—his

superiors were USPIS employees.  *See supra* pp. 15, 20-21.

Second, taking as true that Almaguer made age or longevity related statements

before Plaintiff's termination does not mean that *Defendant* previously discriminated against

Plaintiff as required to show pretext under this prong.  Evidence shows that, based on

Plaintiff's enumerated actions and communications, USPIS made the decision that the

USPIS no longer required Plaintiff's services and wanted her notified after the close of business on March 17, 2017, that "effective immediately," she would no longer be supporting the USPIS. (Doc. 36-2 at 1.) Evidence consistently shows that Weightman terminated Plaintiff's employment with West River Group because her services with USPIS had been terminated. *See supra pp*. 19-21.

Plaintiff cites *Abrams v. Lightolier*, 50 F.3d 1204, 1215 (3d Cir. 1995), and *Doe v. C.A.R.S. Prot. Plus, Inc*., 527 F.3d 358, 368 (3d Cir. 2008), in support of her assertion that she has presented sufficient evidence to establish an inference of discrimination. (Doc. 38 at 16.) *Abrams* dealt with the admissibility at trial of age-related comments by a supervisor whom the defendant contended was not the decisionmaker in the plaintiff's discharge. 50 F.3d at 1210-11. The Circuit Court determined that there was sufficient evidence from which a jury could reasonably conclude that the supervisor was a decisionmaker in the discharge. *Id.* at 1214. *Abrams* further determined that the supervisor's comments were relevant to showing discriminatory animus and, therefore, admissible. *Id.* In discussing the issue of admissibility, *Abrams* noted that the Third Circuit had held that "discriminatory comments by nondecisionmakers . . . could be used to build a circumstantial case of discrimination." *Id.* (citing *Lockhart v. Westinghouse Credit Corp*., 879 F.2s 43, 54 (3d Cir. 1989). This is the notation upon which Plaintiff relies. (*See* Doc. 38 at 15.)   However, this reliance is misplaced based on the fact that the Almaguer comments stand alone.  Where other evidence of discrimination is lacking, stray remarks by nondecionmakers are too

isolated to show independently that unlawful discrimination, rather that the defendant's asserted lawful reason, caused the adverse action. *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). Here, evidence of alleged age-related statements by a nondecisionmaker, statements unrelated to the decision process, is the *only* evidence from which discriminatory animus could be inferred. Therefore, Almaguer's alleged statements cannot support an inference of discrimination sufficient to show pretext.

Plaintiff relies on *Doe* for the Circuit Court's statement that "stray remarks by decision-makers which were unrelated to the decision-making process . . . could provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive." 527 F.3d at 368. *Doe* refers to such evidence as "additional threads of evidence that are relevant to the jury." *Id.* at 369. In *Doe*, before addressing stray remarks, the Circuit Court found that Doe had presented testimony which satisfied her burden of showing that other employees who were similarly situated were treated differently. 527 F.3d at 367. Thus, stray remarks were not the only evidence proffered to discount the defendant's stated reason for discrimination and the Circuit Court commented about stray remarks in the context of relevance rather than stand-alone support for pretext. *Id.* at 368-71. Because Almaguer's alleged statements are the only support for alleged discriminatory animus, they cannot show pretext sufficient to defeat summary judgment for Defendant on Plaintiff's age discrimination based on differential treatment.

**2.  Age Discrimination Based on Hostile Work Environment**

Defendant next argues that Plaintiff's hostile work environment age discrimination claim in Counts I and III of the Complaint (Doc. 1 at 20, 26) fails because she has not established any elements of this claim.  (Doc. 35 at 11.)  Plaintiff does not address this claim in her opposition brief.

The Third Circuit has not "formally recognized a cause of action for hostile work environment under the ADEA." *Lyles v. Phila. Gas Works*, 151 F. App'x 169, 171 n.3 (3d Cir. 2005) (not precedential).  However, in *Slater v. Susquehanna County*, 465 F. App'x 132 (3d Cir. 2012), the Circuit panel stated "[w]e assume, without deciding, that the ADEA makes available a hostile work environment claim for age-based discrimination, analyzed under the same standards as a Title VII hostile work environment claim.  *Id*. at 138 (citing *Brennan v. Metropolitan Opera Ass'n, Inc*., 192 F.3d 310, 318 (2d Cir. 1999); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996)).  Many district courts within the Third Circuit have recognized a cause of action for hostile work environment under the ADEA. *See Real-Loomis v. Bryn Mawr Trust Co.*, Civil Action No. 20-0441, 2021 WL 1907487, at *7 (E.D. Pa. May 12, 2021); *see also Laneve v. Latrobe Steel Co.*, No. CIV.A. 14-216, 2015 WL 4911824, at *6–7 (W.D. Pa. Aug. 17, 2015) (listing cases).  To prevail on such a claim, a plaintiff would have to show the following:

> "'(1) the employee suffered intentional discrimination because of [her age]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a

reasonable person of the same [age] in that position; and (5) the existence of respondeat superior liability.'" *Huston* [v. *Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)] (*quoting Weston* [v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001): *see also Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home*, 2014 WL 2921534, at *4 (E.D. Pa. June 27, 2014) ("The same criteria [utilized in a Title VII gender discrimination case] are utilized when assessing a hostile work environment claim based on age."

*Laneve*, 2015 WL 4911824, at *6.

Defendant is entitled to summary judgment on this claim because Plaintiff failed to refute its argument that all allegations of a hostile work environment are attributed to Almaguer, an employee of the USPIS, Plaintiff said that she saw him for five or six hours in the two weeks he was in charge of the Scranton Domicile, and she has not provided evidence of any conduct by Defendant to establish a hostile work environment.[6] (Doc. 35 at 12.)

### 3. Retaliation

Finally, Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claim in Counts II and IV of the Complaint (Sox. 1 at 23, 27) because she has

---

[6] In determining whether conduct is sufficiently severe or pervasive to create a hostile work environment, the Supreme Court has set out the following framework: "whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001).

Because Plaintiff did not respond to Defendant's argument on the hostile work environment claim, the Court need not discuss the facts of this case in the context of the identified framework. The Court also reviewed Plaintiff's brief in support of her summary judgment motion (Doc. 30) and found no mention of hostile work environment in her brief.

28

failed to establish any elements of this claim.  (Doc. 35 at 12.)  Plaintiff does not address this claim in her opposition brief.

An ADEA retaliation claim is assessed under the *McDonnell Douglas* framework set out above.  In the retaliation context, a plaintiff "first must establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Marra v. Phila. Hous. Auth.,* 497 F.3d 286, 300 (3d Cir. 2007) (internal citations omitted)).

In Count II of her Complaint, Plaintiff states that "[i]n August 2014, Plaintiff Stone put her complaints of discrimination in writing and sent these to the Defendant and also notified Defendant of her filing the charge of illegal age discrimination with the EEOC." (Doc. 1 ¶ 96.)  At her deposition, Plaintiff testified that the Complaint was wrong in that her prior claim of age discrimination was in 2001 or 2002 rather than in 2014 and it was filed against the USPIS rather than Defendant.   (Doc. 35 at 15 (citing Pl.'s Dep. at 96).)  Defendant argues that this discrepancy indicates that Plaintiff has not identified any protected activity.  (*Id*.)  Further discussion of this issue is not warranted based on Plaintiff's failure to respond to Defendant's argument that she not established a prima facie case of retaliation.  Because Plaintiff has not refuted Defendant's argument in support of summary judgment on this claim

and the record does not contradict Defendant's assertions, summary judgment on Plaintiff's retaliation claim in favor of Defendant is appropriate.[7]

## B. Plaintiff's Motion

Having found Defendant entitled to summary judgment on all claims contained in Plaintiff's Complaint (Doc. 1), the Court need not separately consider the Motion for Summary Judgment by Plaintiff' (Doc. 29). *See supra* p.9-10 & n.3.

## V. CONCLUSION

Based on the foregoing analysis, the Court has considered the evidence in the light most favorable to Plaintiff and concludes that Defendant is entitled to summary judgment in its favor on all claims.  Therefore, Defendant's Motion for Summary Judgment (Doc. 34) will be granted. The Motion for Summary Judgment by Plaintiff (Doc. 29) will be denied.  A separate Order will enter.

Robert D. Mariani
United States District Judge

---

[7] In assessing the merits of Defendant's motion on Plaintiff's retaliation claim, the Court reviewed Plaintiff's supporting brief (Doc. 30). Plaintiff provides only a conclusory statement that she established a causal link between her protected activity and her termination.  (Doc. 30 at 2.)  Thus, her supporting brief provides no basis to find that Defendant is not entitled to summary judgment on this claim.